Javier L. Merino
DannLaw
1 Meadowlands Plaza, Suite 200
East Rutherford, NJ 07073
(201) 355-3440
(216) 373-0536 e-fax
notices@dannlaw.com

Linda M. Tirelli
Tirelli Law Group LLC
50 Main Street, Suite 1265
White Plains, NY 10606
(914) 732-3222
LTirelli@TW-LawGroup.com

[Additional Counsel Appear on Signature Page]


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

-------------------------------------------------------X

Justo Reyes
                Debtor                Ch 13 Case No. 16-22556-rdd

Karen Jackson
                Debtor                Ch 13 Case No. 16-23514-rdd

-------------------------------------------------------X

JUSTO REYES and KAREN JACKSON,
individually and on behalf of all others
similarly situated,

          Plaintiffs(s)

v.                                 Adv. No. 19-_____

WELLS FARGO BANK, N.A.,       **CLASS ACTION COMPLAINT**

            Defendant.         **JURY TRIAL DEMANDED**

-------------------------------------------------------X

**COMPLAINT OF PLAINTIFFS JUSTO REYES AND KAREN JACKSON,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED
FOR DAMAGES, SANCTIONS, AND INJUNCTIVE RELIEF**

NOW COME Chapter 13 Debtor Justo Reyes ("Reyes") and Chapter 13 Debtor Karen Jackson ("Jackson") (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by their Bankruptcy Counsel Linda M. Tirelli of Tirelli Law Group LLC, and Special Counsel for the Plaintiffs, Javier Merino, Marc Dann and Brian D. Flick of DannLaw, as well as Thomas A. Zimmerman, Jr. and Matthew C. De Re of Zimmerman Law Offices, P.C., and hereby bring their Complaint against Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant") to the United States Bankruptcy Court and state as follows:

## I.     PRELIMINARY STATEMENT

1.     Plaintiff Reyes commenced his petition for relief under Chapter 13 of Title 11 of the United States Code on April 21, 2016.

2.     Plaintiff Reyes is the owner of the real estate located at 90 Lakeview Avenue, Hartsdale, NY 10530, as disclosed on Schedule A/B filed on May 5, 2016 (the "Reyes property"). *See* Case No. 16-22556, Doc. No. 14.

3.     Plaintiff Reyes listed Wells Fargo as the secured holder of a mortgage on the Reyes property on Schedule D. *Id.*

4.     Plaintiff Jackson commenced her petition for relief under Chapter 13 of Title 11 of the United States Code on November 3, 2016.

5.     Plaintiff Jackson is the joint owner of the real estate located at 29 Manitou Trail, White Plains, NY 10603, as disclosed on Schedule A/B filed on November 3, 2016 (the "Jackson property"). *See* Case No. 16-23514, Doc. No. 1.

6.     Plaintiff Jackson listed Wells Fargo as the holder of a secured mortgage on the Jackson property on Schedule D. *Id.*

## II.     PARTIES

7.     Plaintiff Reyes is a citizen of the United States and an adult resident of the City of Hartsdale, NY.

8.     Plaintiff Jackson is a citizen of the United States and an adult resident of the City of White Plains, NY.

9.     Defendant Wells Fargo Bank, N.A. is a business incorporated under the laws of the State of Delaware.  Defendant maintains its principal place of business at 420 Montgomery Street, San Francisco, California 94104.   Defendant does business in the state of New York and nationwide.  Defendant can be served upon C. Allen Parker, interim CEO of Wells Fargo Bank, N.A., 420 Montgomery Street, San Francisco, CA 94104.

## III.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference previously entered in this District. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

11.     This Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367(a).

12.     This Court location is the proper venue for this action under 28 U.S.C. § 1391(b).

13.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because Defendant is a resident of this District, and a substantial part of the events or omissions giving rise to Plaintiffs' and Class members' claims occurred in this District.

# IV.    STATEMENT OF FACTS

## *Loan Modification Programs*

14.    In light of the 2007-2008 financial crisis, the federal government implemented programs designed to provide relief to mortgage loan borrowers who could no longer afford to make payments on their mortgage loans.  Some of those programs—such as the Home Affordable Modification Program, and other similar programs implemented by the Federal Housing Administration, Fannie Mae, and Freddie Mac—provide eligible homeowners with the opportunity to modify the terms of the mortgages so as to make them more affordable ("Modification Programs").

15.    Under the applicable guidelines for those Modification Programs, participating mortgage loan servicers ("Servicers")—such as Wells Fargo—are required to evaluate borrowers' eligibility for loan modifications ("Loan Modifications").  These eligibility requirements include a borrower's financial hardship, continued employment, income level, lack of prior Loan Modifications, etc.

16.    If a borrower is determined to be eligible for a Loan Modification, a Servicer may place that borrower into a "Trial Period Plan" ("TPP") before the Loan Modification becomes permanent.  Under the terms of a TPP, a borrower is required to make "trial" mortgage payments over a period of three months.  The amount of those "trial" payments is derived from the modified mortgage payment a borrower would have to make if the borrower's Loan Modification is ultimately approved.

17.    If a borrower makes all required "trial" payments pursuant to the terms of a TPP and experiences no change relative to the other Modification Program eligibility requirements, then the borrower will be approved for a permanent Loan Modification.  Essentially, TPPs allow

eligible homeowners to demonstrate that they will be able to make the modified monthly payments once their Loan Modifications become permanent.

18.     Given that a borrower must meet Modification Program eligibility requirements to be placed in a TPP, courts have routinely held that Servicers have a contractual obligation to approve a permanent Loan Modification upon successful completion of a TPP—*i.e.*, once a borrower makes all payments required under a TPP.  *See generally*, *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878 (9th Cir. 2013); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012).

19.     Since Loan Modifications change the terms of existing mortgages, there is a risk that a Loan Modification will cause an existing, superior lien to become subordinate to other liens on a given property.  As such, the guidelines for Modification Programs require Servicers to ensure that modified mortgages remain in a first lien position after a Loan Modification is completed (the "Subordination Process").

20.     However, ensuring that a modified mortgage remains in a first lien position after a Loan Modification is easier said than done.  The Subordination Process usually extends beyond the initial three-month term of a TPP, which requires Servicers to extend the terms of borrowers' TPPs for several additional months.  Even then, subordinate lienholders oftentimes refuse to agree to subordinate their existing liens to a modified mortgage.

21.     Since Modification Programs require that modified mortgages remain in a first lien position after a Loan Modification is completed, if a subordinate lienholder refuses to subordinate its existing lien to a modified mortgage, then a borrower's Loan Modification will be denied.

*Wells Fargo's Loan Modifications*

22.     At all times relevant to this action, Wells Fargo agreed to take part in the Modification Programs established by federal mortgage lenders such as the Federal Housing Administration, Fannie Mae, Freddie Mac and under the Making Homes Affordable Program of the Troubled Asset Relief Program.

23.     At all times relevant to this action, Wells Fargo was the Servicer of Plaintiffs' and Class members' notes, and mortgages on real property that secured those notes (collectively referred to hereinafter as the "mortgages").

24.     Plaintiffs and Class members sought to avail themselves of the Modification Programs offered by Wells Fargo relative to their mortgages, and they either applied for Loan Modifications from Wells Fargo or were offered "streamlined" modifications without application or underwriting. Both underwritten and streamlined modifications required that the borrowers make trial payments before being offered permanent Loan Modifications.

25.     When Plaintiffs and Class members applied for Loan Modifications, they met all eligibility requirements necessary to enter into the Modification Programs offered by Wells Fargo relative to their mortgages.

26.     When Plaintiffs and Class members applied for Loan Modifications, they were unaware that they could be denied permanent Loan Modifications if the Subordination Process failed—*i.e.*, if subordinate lienholders refused to subordinate their existing liens to Plaintiffs' and Class members' modified mortgages.

27.     Pursuant to the terms of the Modification Programs, Wells Fargo determined that Plaintiffs and Class members were eligible for Loan Modifications.

28.     Since Plaintiffs and Class members were eligible for Loan Modifications, Wells Fargo offered to place Plaintiffs and Class members into TPPs.  Pursuant to the terms of those

TPPs, Wells Fargo agreed to give Plaintiffs and Class members permanent Loan Modifications upon Plaintiffs' and Class members' successful completion of their TPPs—*i.e.*, once they make all payments required under the TPPs.

29.     At the time Wells Fargo offered to place Plaintiffs and Class members into TPPs, Wells Fargo knew of the necessity of the Subordination Process relative to permanent Loan Modifications and that Plaintiffs' and Class members' Loan Modifications would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages.

30.     Since the denial of Plaintiffs' and Class members' permanent Loan Modifications would frustrate the entire purpose of their TPPs, the fact that Plaintiffs' and Class members' Loan Modifications would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages was a material fact to Plaintiffs and Class members.

31.     Wells Fargo misrepresented to Plaintiffs and Class members the material terms of the TPPs by stating that it would give Plaintiffs and Class members permanent Loan Modifications upon Plaintiffs' and Class members' successful completion of their TPPs—*i.e.*, once they make all payments required under the TPPs.  As such, Plaintiffs and Class members remained unaware that their Loan Modifications would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages and believed that the material terms of their TPPs were as Wells Fargo had represented them to be.

32.     Plaintiffs and Class members reasonably believed that they were eligible for the Loan Modifications that they requested and that those Loan Modifications would become permanent once they made all payments required by their TPPs. Based upon that reasonable belief, Plaintiffs and Class members entered into TPPs with Wells Fargo.

33.     The fact that Plaintiffs' and Class members' Loan Modifications would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages was not a term of the TPPs into which Plaintiffs and Class members entered with Wells Fargo. Rather, Wells Fargo affirmatively represented that their Loan Modifications would become permanent once they made all payments required by their TPPs.

34.     Plaintiffs and Class members made all modified mortgage payments pursuant to the terms of their TPPs, and continued to meet all eligibility requirements of the Modification Programs for which they applied. As such, Plaintiffs and Class members fully performed their obligations under their TPPs and were contractually entitled to permanent Loan Modifications.

35.     Plaintiffs and Class members never received permanent Loan Modifications because subordinate lienholders refused to subordinate their existing liens to Plaintiffs' and Class members' modified mortgages. As a result, Plaintiffs and Class members were denied permanent Loan Modifications.

36.     The successful completion of the Subordination Process was not a part of the agreements between Wells Fargo and Plaintiffs and Class members. Thus, Wells Fargo breached the terms of the TPPs into which Plaintiffs and Class members entered.

37.     Had Plaintiffs and Class members been aware that the Loan Modifications that they requested would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages, they would not have agreed to enter into TPPs with Wells Fargo. The necessity of the Subordination Process was a material term to Plaintiffs and Class members.

38.     As a direct and proximate result of Wells Fargo's misrepresentations concerning the terms of the TPPs and the necessity of the Subordination Process, Plaintiffs and Class members were harmed because they entered into the TPPs, and made payments pursuant to the terms of

those TPPs, under the false impression that they were eligible for permanent Loan Modifications and that their Loan Modifications would become permanent if they made all payments required by their TPPs.

39.     Plaintiffs and Class members were also harmed because, by virtue of making payments pursuant to the terms of their TPPs, they reset the applicable statutes of limitations relative to the collectability of those debts.

40.     Additionally, Plaintiffs and Class members suffered emotional damages related to the fact that they believed they had completed all prerequisites necessary to save their homes from being foreclosed upon, but then had the rug pulled out from under them by Wells Fargo when they were then informed that those efforts were insufficient.

41.     Plaintiffs, individually, and on behalf of the Class, seek recovery of the damages they incurred as a result of Wells Fargo's breach of contract and misrepresentations regarding the material terms of Plaintiffs' and Class members' TPPs.  Plaintiffs, individually, and on behalf of the Class, also seek injunctive and declaratory relief to nullify the effect of the payments they made pursuant to the terms of their TPPs on the collectability of the debts secured by their mortgages.

42.     Recently, Wells Fargo has been mailing letters ("Settlement Letters") with a check enclosed to Plaintiffs and Class members stating: "We had previously approved this loan for a modification trial plan, but the loan was subsequently removed from home preservation prior to the final modification.  We should have let you know at the time of trial approval that the modification might be denied due to title issues even if you paid the trial period payments…We've enclosed a check for $300.00 to fully settle this issue."

43.     However, the $300.00 offered by Wells Fargo in its Settlement Letters does not come close to adequately compensating Plaintiffs and Class members for the damages they incurred as a result of Wells Fargo's conduct.

44.     Given that Wells Fargo was aware of its misrepresentations and contractual breaches concerning the material terms of the TPPs it entered into with borrowers and, as a result, changed the language in its TPPs in 2013 or 2014, the recency of the Settlement Letters evidences an intentional effort to conceal its violations from Plaintiffs and Class members. Put another way, Wells Fargo intentionally waited to reveal the problem until the potential remedies to the Plaintiffs and Class members were limited by the passage of time.

45.     Since they had previously entered into TPPs with Wells Fargo, Wells Fargo knows that Plaintiffs and members of the Class were, and continue to be, in a difficult financial situation. As such, like Plaintiffs, many Class members desire to cash the checks enclosed with the Settlement Letters they received due to their financial circumstances.

46.     For this reason, Wells Fargo knows that Class members would be more likely to accept pennies on the dollar to waive any claims they may have against Wells Fargo. This is compounded by the fact that Class members are unlikely to remember the exact amount of money they paid to Wells Fargo pursuant to the terms of their TPPs, and would not even be aware that they are accepting such a measly sum.

47.     In addition, since Class members were denied permanent Loan Modifications, many of them have already had their homes foreclosed upon years ago, and have no idea that they may be able to revisit any issues arising out of that process. For the same reason, most Class members have terminated their relationships with counsel who represented them in their foreclosure proceedings.

48. As such, many Class members will view the checks enclosed with the Settlement Letters as an act of generosity on the part of Wells Fargo, would be unaware of the legal implications of cashing those checks, and would be unlikely to consult with counsel regarding those legal implications.

49. In light of the foregoing, the Settlement Letters are an unduly coercive act on the part of Wells Fargo, as Wells Fargo knows that it is taking advantage of Class members' difficult financial situations and that Class members are unlikely to be aware of "what they are possibly giving up" by cashing the checks enclosed with the Settlement Letters. *Friedman v. Intervet Inc.*, 730 F.Supp.2d 758, 763 (N.D. Ohio 2010) (collecting cases).

50. Accordingly, Plaintiffs, individually, and on behalf of the Class, seek preliminary injunctive and declaratory relief to ensure that Plaintiffs and Class members do not waive their right to recover damages in this action in the event that they cash the checks that Wells Fargo sent with the Settlement Letters.

## IV. FACTS RELATIVE TO PLAINTIFFS

### *Plaintiff Reyes*

51. At all times relevant to this action, Wells Fargo was the Servicer of Plaintiff Reyes's mortgage.

52. In October or November 2010, Plaintiff Reyes submitted a complete application to Wells Fargo to avail himself of a Loan Modification.

53. When Plaintiff Reyes applied for his Loan Modification, he met all eligibility requirements of that Modification Program.

54. After determining that Plaintiff Reyes was eligible for his requested Loan Modification, Wells Fargo offered to place him into a TPP. Pursuant to the terms of that TPP,

Plaintiff Reyes was required to make trial plan payments to Wells Fargo in the amount of $3,467.89, the payment of which would result in a permanent Loan Modification. *See*, Status Report filed by Dennis Jose, Doc. 64, attached hereto as <u>Exhibit A</u>.

55.     Wells Fargo misrepresented the material terms of Plaintiff Reyes's TPP, as it represented that Plaintiff Reyes would be given a permanent Loan Modification once he paid the required payments pursuant to the terms of his TPP.

56.     Plaintiff Reyes reasonably believed that he was eligible for the Loan Modification that he requested and that the Loan Modification would become permanent once he made all payments required by his TPP.  Based upon that reasonable belief, Plaintiff Reyes entered into the TPP with Wells Fargo and began making modified monthly mortgage payments.

57.     After making the three required TPP payments, Plaintiff Reyes was informed that his Loan Modification was denied.  *See*, <u>Exhibit A</u>.

58.     Although Plaintiff Reyes had made all payments required by the terms of his TPP, Plaintiff Reyes's Loan Modification was denied because a subordinate lienholder refused to subordinate its existing lien to Plaintiffs' modified mortgage.  *See*, <u>Exhibit A</u>.

59.     Had Plaintiff Reyes been aware that his requested Loan Modification would be denied if a subordinate lienholder refused to subordinate its existing lien to his modified mortgage, he would not have agreed to enter into a TPP with Wells Fargo.

60.     As a direct and proximate result of Wells Fargo's misrepresentations as to the terms of the TPP and the necessity of the Subordination Process, Plaintiff Reyes was harmed because he entered into a TPP, and made payments pursuant to the terms of that TPP, under the false impression that he was eligible for a permanent Loan Modification and that the Loan Modification would become permanent if he made all payments required by his TPP.

61.     Plaintiff Reyes was also harmed because, by virtue of making payments pursuant to the terms of his TPP, he reaffirmed the debt secured by his mortgage and reset the applicable statute of limitations relative to the collectability of that debt.

62.     Specifically, prior to making payments pursuant to the terms of his TPP, Plaintiff Reyes's last payment relative to his mortgage was made in November 2009. As such, the applicable statute of limitations relative to the collectability of that debt would have started running from that date. However, because Plaintiff Reyes made payments pursuant to the terms of his TPP, the applicable statute of limitations relative to the collectability of his mortgage debt was extended by more than a year.

63.     On or about April 9, 2019 Wells Fargo sent Plaintiff Reyes a Settlement Letter. *See*, Reyes's Settlement Letter, attached hereto as <u>Exhibit B</u>.

64.     In the Settlement Letter that Wells Fargo sent to Plaintiff Reyes, Wells Fargo stated:

> We had previously approved this loan for a modification trial plan, but the loan was subsequently removed from home preservation prior to the final modification. We should have let you know at the time of trial approval that the modification might be denied due to title issues even if you paid the trial period payments.
>
> We apologize for our oversight. We want to make it right.

*See*, <u>Exhibit B</u>.

65.     Enclosed with the Settlement Letter that Wells Fargo sent to Plaintiff Reyes was a check to Plaintiff Reyes in the amount of $300.00. *Id.*

66.     Based on the modified monthly mortgage payments Plaintiff Reyes made pursuant to the terms of his TPP, Plaintiff Reyes paid Wells Fargo approximately $10,403.67. Although this is not the entire amount of Plaintiff Reyes's damages—as that amount will be ascertained at

trial—it far exceeds the $300.00 Wells Fargo offered Reyes in his Settlement Letter. *See*, Proof of Claim, attached hereto as <u>Exhibit C</u>.

67.     Although Plaintiff Reyes desires to cash the check enclosed with the Settlement Letter he received, he is unable to do so because he does not want to fully release all of his claims against Wells Fargo and this Court has not issued an Order permitting him to do so.

### *Plaintiff Jackson*

68.     Upon belief based on the information in Proof of Claim filed in Plaintiff Jackson's Bankruptcy Case which is attached as <u>Exhibit D</u> to this Complaint, Wells Fargo was the servicer of Plaintiff Jackson's Mortgage Loan from May 25, 2011 through April 18, 2016. *See*, <u>Exhibit D</u>.

69.     In June or July 2012, Plaintiff Jackson submitted a complete application to Wells Fargo to avail herself of a Loan Modification.

70.     When Plaintiff Jackson applied for her Loan Modification, she met all of the eligibility requirements of that Modification Program.

71.     After determining Plaintiff Jackson was eligible for her requested Loan Modification, Wells Fargo offered to place her into a TPP.  Pursuant to the terms of that TPP, Plaintiff Jackson was required to make three monthly payments of approximately $1,889.81, the payment of which would result in a permanent Loan Modification.

72.     Wells Fargo misrepresented the material terms of Plaintiff Jackson's TPP, as it represented that Plaintiff Jackson would be given a permanent Loan Modification once she paid the required payments pursuant to the terms of her TPP.

73.     Plaintiff Jackson reasonably believed that she was eligible for the Loan Modification that she requested and that the Loan Modification would become permanent once

she made all payments required by her TPP.  Based upon that reasonable belief, Plaintiff Jackson entered into the TPP with Wells Fargo and began making modified monthly mortgage payments.

74.     Plaintiff Jackson made five payments of $1,889.81 to Wells Fargo from September 27, 2012 through January 21, 2013. *See*, Exhibit D.

75.     In or about February 2013, Wells Fargo informed Plaintiff Jackson that her Loan Modification was denied.

76.     Although Plaintiff Jackson had made all payments required by the terms of her TPP, Plaintiff Jackson's Loan Modification was denied because a subordinate lienholder refused to subordinate its existing lien to Plaintiff Jackson's modified mortgage.

77.     Had Plaintiff Jackson been aware that her requested Loan Modification would be denied if a subordinate lienholder refused to subordinate its existing lien to her modified mortgage, she would not have agreed to enter into a TPP with Wells Fargo.

78.     As a direct and proximate result of Wells Fargo's misrepresentations as to the terms of the TPP and the necessity of the Subordination Process, Plaintiff Jackson was harmed because she entered into a TPP, and made payments pursuant to the terms of that TPP, under the false impression that she was eligible for a permanent Loan Modification and that the Loan Modification would become permanent if she made all payments required by her TPP.

79.     Plaintiff Jackson was also harmed because, by virtue of making payments pursuant to the terms of the TPP, she reaffirmed the debt secured by her mortgage and reset the applicable statute of limitations relative to the collectability of that debt.

80.     Specifically, prior to making payments pursuant to the terms of her TPP, Plaintiff Jackson's last payment relative to her mortgage was made on May 1, 2012.  As such, the applicable statute of limitations relative to the collectability of that debt would have started running from that

date. However, because Plaintiff Jackson made payments pursuant to the terms of her TPP, the applicable statute of limitations relative to the collectability of her mortgage debt was extended by over eight months.

81.     On or about March 21, 2019 Wells Fargo sent Plaintiff Jackson a Settlement Letter. *See*, Jackson's Settlement Letter, attached hereto as <u>Exhibit E</u>.

82.     In the Settlement Letter that Wells Fargo sent to Plaintiff Jackson,  Wells Fargo stated:

> We had previously approved this loan for a modification trial plan, but the loan was subsequently removed from home preservation prior to the final modification. We should have let you know at the time of trial approval that the modification might be denied due to title issues even if you paid the trial period payments.
>
> We apologize for our oversight. We want to make it right.

*See*, <u>Exhibit E</u>.

83.     Enclosed with the Settlement Letter that Wells Fargo sent to Plaintiff Jackson was a check to Plaintiff Jackson in the amount of $300.00.  *Id.*

84.     Based on the modified monthly mortgage payments Plaintiff Jackson made pursuant to the terms of her TPP, Plaintiff Jackson paid Wells Fargo approximately $9,449.05. *See*, <u>Exhibit D</u>.  Although this is not the entire amount of Plaintiff Jackson's damages—as that amount will be ascertained at trial—it far exceeds the $300.00 Wells Fargo offered Plaintiff Jackson in her Settlement Letter.

85.     Although Plaintiff Jackson desires to cash the check enclosed with the Settlement Letter she received, she is unable to do so because she does not want to fully release all of her claims against Wells Fargo and this Court has not issued an Order permitting her to do so.

**V.      CLASS ACTION ALLEGATIONS**

86.     **Class Definition**: Plaintiffs Reyes and Jackson bring this action pursuant to Fed R.

Civ. P. 23 by way of Fed. R. Bankr. P. 7023 on behalf of a class of similarly situated individuals

and entities (the "Class"), defined as follows:

> All loan borrowers in the United States Bankruptcy Court for the Southern
> District of New York who (1) filed for Chapter 13 Bankruptcy in the
> Southern District of New York; (2) owed amounts to Wells Fargo, as
> servicer and/or holder, on debt secured by real property; (3) entered into a
> TPP with Wells Fargo; (4) whose TPP did not contain an express provision
> stating that they could be refused a permanent Loan Modification in the
> event that a subordinate lienholder refused to subordinate its existing lien to
> their modified mortgage; (5) made all required payments pursuant to the
> terms of that TPP; and (6) were denied a permanent Loan Modification
> because a subordinate lienholder refused to subordinate its existing lien to
> his or her modified mortgage.

87.     Excluded from the Class are (1) All loan borrowers outside of the United States

Bankruptcy Court for the Southern District of New York; (2) the Judge to whom this case is

assigned and the Judge's immediate family members; (3) Defendant's agents; (4) any person(s)

who executes and files a timely request for exclusion from the Class; (5) any persons who have

had their claims in this matter finally adjudicated and/or otherwise released; and (6) the legal

representatives, successors and assigns of any such excluded person.

88.     **Numerosity and Ascertainability**: Upon information and belief, the Class is

comprised of more than 40 members.  This conclusion is reasonable because Wells Fargo is one

of the largest mortgage providers in the country, which, as of 2012, held approximately thirty

percent (30%) of the market share for mortgages in the United States.  The Class is so numerous

that joinder of all members is impractical.  The exact number of members in the Class is presently

unknown, can only be ascertained through discovery, and can easily be identified through

Defendant's records or by other means.  In fact, Wells Fargo has likely already identified many

Class members and is in the process of sending Settlement Letters to them.

89.     **Commonality and Predominance**: All members of the Class have been subject to and affected by a uniform course of conduct: specifically, Wells Fargo misrepresenting the material terms relative to their Loan Modifications and that they could be denied due to the failure of the Subordination Process. Additionally, the terms of the TPPs into which Plaintiffs and Class members entered were substantially similar, and were breached by Wells Fargo in the same way. Accordingly, there are questions of law and fact common to the proposed Class that predominate over any individual questions.

90.     **Typicality**: Plaintiffs' claims are typical of the claims of the Class. The terms of Plaintiffs' and Class members' TPPs were substantially similar, and required Plaintiffs and Class members to make mortgage payments that they otherwise would not have been required to make. Therefore, Plaintiffs and Class members were all harmed in the same way, and incurred damages as a result.

91.     **Adequacy**: Plaintiffs will adequately represent the interests of the Class and do not have adverse interests to the Class. If individual Class members prosecuted separate actions it may create a risk of inconsistent or varying judgments that would establish incompatible standards of conduct. A class action is the superior method for the quick and efficient adjudication of this controversy. Plaintiffs' counsel has extensive experience litigating consumer class actions.

**COUNT I**
**Breach of Contract**

92.     Plaintiffs repeat and reallege paragraphs 1-91, with the same force and effect as though fully set forth herein.

93.     After Plaintiffs and Class members submitted Loan Modification applications to Wells Fargo, Wells Fargo offered to permanently modify the terms of Plaintiffs' and Class

members' existing mortgages. This offer was evidenced by, and contained within, the TPPs Wells Fargo provided to Plaintiffs and Class members.

94. Pursuant to the terms of the TPPs Wells Fargo offered to Plaintiffs and Class members, Wells Fargo agreed to permanently modify the terms of Plaintiffs' and Class members' existing mortgages once they made all payments required under their TPPs and if their preexisting eligibility status—which had already been determined—did not change.

95. Plaintiffs and Class members accepted Wells Fargo's offer and began making payments as required by their TPPs.

96. Wells Fargo provided consideration to Plaintiffs and Class members in the form of its promise to permanently modify the terms of their existing mortgages once they made the payments required under their TPPs.

97. Plaintiffs and Class members provided consideration to Wells Fargo by paying Wells Fargo on the TPPs. Further, Plaintiffs and Class members provided Wells Fargo with financial information and verified its accuracy. Plaintiffs and Class members gave up potential defenses to the collection of their mortgage note because, by virtue of making payments pursuant to the terms of their TPPs, they reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages.

98. Plaintiffs and Class members performed all terms required by their TPPs, as they made each payment pursuant to the terms of their TPPs and remained eligible for Loan Modifications pursuant to the terms of the applicable Modification Programs.

99. Despite the fact that Plaintiffs and Class members fully performed all of their obligations under their TPPs, Wells Fargo did not give them permanent Loan Modifications as it had promised.

100.    Wells Fargo did not give Plaintiffs and Class members permanent Loan Modifications because subordinate lienholders refused to subordinate their existing liens to Plaintiffs' and Class members' modified mortgages.  However, this was never a term of the agreements between Plaintiffs and Class members and Wells Fargo.  Thus, Wells Fargo breached the terms of the TPPs it entered into with Plaintiffs and Class members.

101.    Plaintiffs and Class members are entitled to restitution damages in the form of all payments they made pursuant to the terms of their TPPs.

102.    In addition, because Plaintiffs and Class members reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages by virtue of making payments pursuant to the terms of their TPPs, Plaintiffs and Class members seek injunctive relief to prohibit Wells Fargo from collecting those debts after the original period of collectability would have otherwise expired.

103.    Plaintiffs and the Class members also seek injunctive relief to ensure that Plaintiffs and Class members do not waive their right to recover damages in this action in the event that they cash the checks that Wells Fargo sent with the Settlement Letters.

**COUNT II**
**Unjust Enrichment/Restitution**
**(In the Alternative to Count I)**

104.    Plaintiffs repeat and reallege paragraphs 1-91, with the same force and effect as though fully set forth herein.

105.    Wells Fargo has been unjustly enriched to Plaintiffs' and the Class members' detriment as a result of its unlawful and wrongful retention of money conferred by Plaintiffs and

the Class members who were unaware that Wells Fargo would not make Plaintiffs' and Class members' Loan Modifications permanent once Plaintiffs and Class members made the agreed upon payments if subordinate lienholders refused to subordinate their existing liens to Plaintiffs' and Class members' modified mortgages, such that Defendant's retention of their money would be inequitable.

106. Defendant's unlawful and wrongful acts, including representing to Plaintiffs and Class members that it would permanently modify the terms of Plaintiffs' and Class members' existing mortgages once they made all payments required under their TPPs, as alleged above, enabled Defendant to unlawfully receive monies it would not have otherwise obtained.

107. Plaintiffs and the Class members have conferred benefits on Defendant, which Defendant has knowingly accepted and retained.

108. Defendant's retention of the benefits conferred by Plaintiffs and the Class members would be against fundamental principles of justice, equity, and good conscience.

109. Plaintiffs and the Class members seek to disgorge Defendant's unlawfully retained profits and other benefits resulting from its unlawful conduct, and seek restitution and rescission for the benefit of Plaintiffs and the Class members.

110. Plaintiffs and the Class members are entitled to the imposition of a constructive trust upon Defendant, such that its unjustly retained profits and other benefits are distributed equitably by the Court to and for the benefit of Plaintiffs and the Class members.

111. Based on the foregoing, Plaintiffs and the Class members have been injured in an amount to be determined at trial.

## COUNT III
### Declaratory Judgment
### (28 U.S.C. §§ 2201, *et seq.*)

112.    Plaintiffs repeat and reallege paragraphs 1-91, with the same force and effect as though fully set forth herein.

113.    After Plaintiffs and Class members submitted Loan Modification applications to Wells Fargo, Wells Fargo offered to permanently modify the terms of Plaintiffs' and Class members' existing mortgages.  This offer was evidenced by, and contained within, the TPPs Wells Fargo provided to Plaintiffs and Class members.

114.    Pursuant to the terms of the TPPs Wells Fargo offered to Plaintiffs and Class members, Wells Fargo agreed to permanently modify the terms of Plaintiffs' and Class members' existing mortgages once they made all payments required under their TPPs and if their preexisting eligibility status—which had already been determined—did not change.

115.    Plaintiffs and Class members accepted Wells Fargo's offer and began making payments as required by their TPPs.

116.    Wells Fargo provided consideration to Plaintiffs and Class members in the form of its promise to permanently modify the terms of their existing mortgages once they made the payments required under their TPPs.

117.    Plaintiffs and Class members provided consideration to Wells Fargo in the form of the payments they made when entering into the TPPs.  For example, Plaintiffs and Class members provided Wells Fargo with financial information and verified its accuracy.  Plaintiffs and Class members also incurred new legal detriments because, by virtue of making payments pursuant to the terms of their TPPs, they reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages.

118. Plaintiffs and Class members performed all terms required by their TPPs, as they made each payment pursuant to the terms of their TPPs and remained eligible for Loan Modifications pursuant to the terms of the applicable Modification Programs.

119. Despite the fact that Plaintiffs and Class members fully performed all of their obligations under their TPPs, Wells Fargo did not give them permanent Loan Modifications as it had promised.

120. Wells Fargo did not give Plaintiffs and Class members permanent Loan Modifications because subordinate lienholders refused to subordinate their existing liens to Plaintiffs' and Class members' modified mortgages. However, this was never a term of the agreements between Plaintiffs and Class members and Wells Fargo. Thus, Wells Fargo breached the terms of the TPPs it entered into with Plaintiffs and Class members.

121. By virtue of making payments pursuant to the terms of their TPPs, Plaintiffs and Class members reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages. However, those actions were performed pursuant to the terms of a contract that was breached by Wells Fargo and should have no legal effect.

122. Accordingly, Plaintiffs and Class members seek a declaration that they did not reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages by virtue of making payments pursuant to a breached contract—*i.e.*, the TPPs—and that the applicable statutes of limitations relative to the collectability of those debts is to run from the date that Plaintiffs and Class members last made a payment prior to entering into TPPs with Wells Fargo.

123. The controversies presented in this case are definite and concrete, and affect the adverse legal interests of the parties. Plaintiffs and Class members have a legal interest in a shorter

time period relative to the collectability of the debts secured by their mortgages, and Wells Fargo has an opposing tangible legal interest in a longer time period of collectability. This case will determine the legal rights of all parties.

124. If the Court were to deny Plaintiffs' and Class members' request for declaratory relief, this controversy will continue to exist, as Wells Fargo will continue to assert that the period of collectability relative to the debts secured by Plaintiffs' and Class members' mortgages runs from the date when Plaintiffs and Class members last made a payment pursuant to the terms of their TPPs, and Plaintiffs and Class members will continue to assert that those payments are invalid and have no legal effect.

125. Based on the foregoing facts, the Court should declare that the applicable statutes of limitations relative to the collectability of the debts secured by Plaintiffs' and Class members' mortgages is to run from the date that Plaintiffs and Class members last made a payment prior to entering into TPPs with Wells Fargo.

## COUNT IV
### Violation of New York General Business Law 349

126. Plaintiffs repeat and reallege paragraphs 1-91 with the same force and effect as though fully set forth herein.

127. Plaintiffs and members of the Class are each a "person" within the meaning of N.Y. Gen. Bus. Law 349(h).

128. N.Y. Gen. Bus. Law 349(a) makes unlawful deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in New York State.

129. Loan Modifications are consumer goods or services.

130. Wells Fargo engaged, and still engages, in unfair and deceptive acts or practices when, in marketing and selling Loan Modifications, Wells Fargo misrepresented to Plaintiffs and

Class members that it would permanently modify the terms of Plaintiffs' and Class members' existing mortgages once they made all payments required under their TPPs, as alleged above.

131. Wells Fargo intended, and still intends, that Plaintiffs and the members of the Class rely upon Wells Fargo's misrepresentations and omissions concerning whether to permanently modify the terms of Plaintiffs' and Class members' existing mortgages once they made all payments required under their TPPs, as alleged above.

132. Wells Fargo's misrepresentations and omissions possess the tendency or capacity to mislead and create the likelihood of deception.

133. The above-described deceptive and unfair acts and practices were used or employed in the conduct of trade or commerce, namely, the marketing and sale of Loan Modifications to Plaintiffs and Class members.

134. The above-described deceptive and unfair acts offend public policy and cause substantial injury to consumers.

135. Plaintiffs and the Class members relied upon Wells Fargo's misrepresentations and omissions described above.

136. Acting as reasonable consumers, had Plaintiffs and the Class members known that the Loan Modifications that they requested would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages, they would not have agreed to enter into TPPs with Wells Fargo. The necessity of the Subordination Process was a material term to Plaintiffs and Class members.

137. Plaintiffs and Class members could not have reasonably avoided the injuries suffered by entering into TPPs with Wells Fargo because it was reasonable for Plaintiffs and Class members to rely on Defendant's misrepresentations and omissions.

138. As a direct and proximate result of these unfair, deceptive and unconscionable commercial practices, Plaintiffs and the members of the Class have suffered damages in the form of all payments they made pursuant to the terms of their TPPs.

139. In addition, because Plaintiffs and Class members reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages by virtue of making payments pursuant to the terms of their TPPs, Plaintiffs and Class members seek injunctive relief to prohibit Wells Fargo from collecting those debts after the original period of collectability would have otherwise expired.

140. The injury suffered by consumers as a result of Wells Fargo's unfair and unlawful conduct is substantial because consumers unknowingly made payments to Wells Fargo pursuant to the terms of their TPPs, and reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages by virtue of making payments pursuant to the terms of their TPPs.

141. The substantial injury to consumers outweighs any benefit to consumers or competition that may result from Defendant's misrepresentations regarding their Loan Modifications.

142. Wells Fargo's intentional and willful conduct complained of herein, *supra,* consisted of deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in New York in violation of N.Y. Gen. Bus. Law 349(a).

143. Wells Fargo's deceptive and misleading acts described herein, *supra*, directly and proximately caused damages and injuries to the Plaintiffs and Class including actual damages, including but not limited to, the misapplication of the TPP payments.

144.    As a result of Wells Fargo's actions, Wells Fargo is liable for actual damages, statutory damages, costs, and attorneys' fees, as well as injunctive relief, pursuant to N.Y. Gen. Bus. Law 349(h).

## COUNT V
### Violation of 3 NYCRR 419.3

145.    Plaintiffs repeat and reallege paragraphs 1-91 with the same force and effect as though fully set forth herein.

146.    Pursuant to 3 NYCRR 419.3, Wells Fargo as a company registered and doing business in New York and is required to obey New York Law.

147.    Pursuant to 3 NYCRR 419.3, Wells Fargo is required at all times to conduct its business in accordance with the requirements as set forth in various federal consumer protection statutes, including but not limited to the Real Estate Settlement Procedures Act and the Fair Debt Collection Practices Act, in addition to being required to comply with New York state consumer protection statutes, including but not limited to New York Gen. Bus. Law 349.

148.    As described herein, *supra*, Wells Fargo has violated numerous sections of the Bankruptcy Code and NY Gen. Bus. Law 349.

149.    As such, Wells Fargo is in violation of 3 NYCRR 419.3, and Wells Fargo is liable for actual damages, statutory damages, costs, and attorneys' fees, as well as injunctive relief.

## COUNT VI
### Contempt of Court

150.    Plaintiffs repeat and reallege paragraphs 1-91, with the same force and effect as though fully set forth herein.

151.    11 U.S.C. § 105(a) permits the Court to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this Title.

152. Based on the allegations contained herein, *supra*, and as demonstrated by Exhibits B and E, there is no dispute that the actions of Wells Fargo in issuing Exhibits B and E admitted a harm to each Plaintiff and the Class that Wells Fargo knew, or should have known, existed during the pendency of each Chapter 13 case of the Plaintiffs and the Class.

153. There is no dispute that Wells Fargo is well familiar with the Bankruptcy Code, Wells Fargo is frequently involved with numerous cases in some capacity in the Southern District of New York Bankruptcy Court as well as Bankruptcy Courts throughout the country.

154. The acts of Wells Fargo described herein, *supra*, demonstrate a willful pattern of overt acts that violate Orders issued by the Bankruptcy Court in each of the cases of the Plaintiffs and Class, including but not limited to: (1) Orders confirming Chapter 13 Plans; (2) Orders granting imposition of the automatic stay; (3) Orders granting relief from automatic stay; (4) Orders modifying Chapter 13 Plans; and/or (5) Orders related to Bankr. R. 3002.1, which must be stopped by this Court.

155. As a result of the above violations described herein, *supra*, Wells Fargo is liable to the Plaintiffs and the Class for actual damages in an amount to be determined by this Court and/or an award of punitive damages pursuant to 11 U.S.C. § 105.

<u>**COUNT VII**</u>
**Fraudulent Misrepresentation**

156. Plaintiffs repeat and reallege paragraphs 1-91 with the same force and effect as though fully set forth herein.

157. After Plaintiff and Class members submitted Loan Modification applications to Wells Fargo, Wells Fargo offered to permanently modify the terms of Plaintiff's and Class members' existing mortgages if they entered into TPPs.

158.    At the time Wells Fargo offered to place Plaintiff and Class members into TPPs, Wells Fargo represented to Plaintiff and Class members that it would permanently modify the terms of Plaintiff's and Class members' existing mortgages once they made all payments required under their TPPs and if their preexisting eligibility status—which had already been determined—did not change.

159.    Wells Fargo knew of the necessity of the Subordination Process relative to permanent Loan Modifications and knew that it would not permanently modify the terms of Plaintiff's and Class members' existing mortgages if subordinate lienholders refused to subordinate their existing liens to Plaintiff's and Class members' modified mortgages.

160.    Wells Fargo also knew that Plaintiff and Class members would be unwilling to enter into TPPs if their permanent Loan Modifications were contingent upon the successful completion of the Subordination Process or that their Loan Modifications would be denied if subordinate lienholders refused to subordinate their existing liens to Plaintiff's and Class members' modified mortgages.

161.    As such, Wells Fargo knew that its representations regarding the material terms of Plaintiff's and Class members' TPPs were false.

162.    By misrepresenting the material terms of Plaintiff's and Class members' TPPs, Wells Fargo intended to induce Plaintiff and Class members into entering into agreements that they would not otherwise have been willing to enter into.

163.    In reliance on Wells Fargo's misrepresentations, Plaintiff and Class members entered into TPPs with Wells Fargo.

164.    Wells Fargo's misrepresentations were part of a scheme to defraud Plaintiff and Class members. In short, Wells Fargo knew that it could secure additional mortgage payments

from Plaintiff and Class members by fraudulently inducing Plaintiff and Class members to enter into TPPs with the promise that their Loan Modifications would be made permanent once Plaintiff and Class members made the agreed upon payments. However, at the time Wells Fargo made that promise, Wells Fargo knew that it would not make Plaintiff's and Class members' Loan Modifications permanent once Plaintiff and Class members made the agreed upon payments if subordinate lienholders refused to subordinate their existing liens to Plaintiff's and Class members' modified mortgages.

165. As a direct and proximate result of Wells Fargo's misrepresentations, Plaintiff and Class members paid payments that they wouldn't otherwise have paid, suffered financial and emotional damages, and reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages.

166. Plaintiff and Class members seek monetary damages and injunctive relief to prohibit Wells Fargo from collecting those debts after the original period of collectability would have otherwise expired.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Justo Reyes and Karen Jackson, individually, and on behalf of the Class, pray for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class defined herein;

B. Designating Plaintiffs Justo Reyes and Karen Jackson as representatives of the Class and their undersigned counsel as Class Counsel;

C. Entering judgment in favor of Plaintiffs and the Class and against Defendant as to each and every Count, as applicable;

D. Awarding Plaintiffs and the Class statutory damages in an amount to be determined at trial as to each and every Count, as applicable;

E.   Awarding Plaintiffs and the Class actual damages in an amount to be determined at trial as to each and every Count, as applicable;

F.   Awarding Plaintiffs and the Class punitive damages in an amount to be determined at trial as to each and every Count, as applicable;

G.   Granting Plaintiffs and the Class injunctive relief to prohibit Wells Fargo from collecting their debts after the original period of collectability would have otherwise expired;

H.   Granting Plaintiffs and the Class injunctive relief to ensure that Plaintiffs and Class members do not waive their right to recover damages in this action in the event that they cash the checks that Wells Fargo sent with the Settlement Letters;

I.   Declaring that Plaintiffs and Class members did not reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages by virtue of making payments pursuant to a breached contract—*i.e.*, the TPPs—and that the applicable statutes of limitations relative to the collectability of those debts is to run from the date that Plaintiffs and Class members last made a payment prior to entering into TPPs with Wells Fargo;

J.   Declaring that Plaintiffs and Class members do not waive their right to recover damages in this action in the event that they cash the checks that Wells Fargo sent with the Settlement Letters;

K.   Awarding Plaintiffs and the Class attorneys' fees and costs, including interest thereon, as allowed or required by law; as to each and every Count, as applicable; and

L.   Granting all such further and other relief as this Court deems just and appropriate.


## JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.



**DATE: April 12, 2019**      /s/Linda M. Tirelli
                              Tirelli Law Group LLC
                              50 Main Street, Suite 1265
                              White Plains, NY 10606
                              (914) 732-3222

                              Javier L. Merino
                              DannLaw

1 Meadowlands Plaza, Suite 200
East Rutherford, NJ 07073
(201) 355-3440
(216) 373-0536 e-fax
notices@dannlaw.com

Thomas A. Zimmerman, Jr.
*tom@attorneyzim.com*
Matthew C. De Re
*matt@attorneyzim.com*
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
*Pro Hac Vice Anticipated*

Marc E. Dann
Brian D. Flick
DANNLAW
P.O. Box 6031040
Cleveland, OH  44103
(216) 373-0539 telephone
(216) 373-0536 facsimile
*notices@dannlaw.com*
*Pro Hac Vice Anticipated*

*Attorneys for Debtors and the Class*