Javier L. Merino
DannLaw
1 Meadowlands Plaza, Suite 200
East Rutherford, NJ 07073
(201) 355-3440
(216) 373-0536 e-fax
notices@dannlaw.com

Linda M Tirelli
Tirelli Law Group LLC
50 Main Street, Ste. 1265
White Plains, NY 10606
(914) 732-3222
LTirelli@TW-LawGroup.com

[Additional Counsel Appear on Signature Page]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

-------------------------------------------------X

| | |
|---|---|
| Justo Reyes | |
|       Debtor | Ch 13 Case No. 16-22556-rdd |
| Karen Jackson | |
|       Debtor | Ch 13 Case No. 16-23514-rdd |

-------------------------------------------------X

JUSTO REYES and KAREN JACKSON,
individually and on behalf of all others
similarly situated,

      Plaintiffs(s)      Adv. No. 19-08248-rdd (Reyes case)

v.

                                   Adv. No. 19-08249-rdd (Jackson case)

WELLS FARGO BANK, N.A.,

      Defendant.

-------------------------------------------------X

**MEMORANDUM IN SUPPORT OF PLAINTIFF JUSTO REYES AND PLAINTIFF KAREN JACKSON'S MOTION FOR PRELIMINARY INJUNCTION**

NOW COME Chapter 13 Debtor Justo Reyes ("Reyes") and Chapter 13 Debtor Karen Jackson ("Jackson") (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by their Bankruptcy Counsel Linda M. Tirelli of Tirelli Law Group LLC, and Special Counsel for the Plaintiffs, Javier Merino, Marc Dann and Brian D. Flick of DannLaw, as well as Thomas A. Zimmerman, Jr. and Matthew C. De Re of Zimmerman Law Offices, P.C., and for their *Memorandum in Support of Their Motion for a Preliminary Injunction* ("Motion") against Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant") hereby state as follows:[1]

## I. INTRODUCTION AND BACKGROUND

### A. Loan Modification Programs

The 2008 housing meltdown threw an unprecedented number of homeowners into default on their mortgage loans. In response, the federal government created several programs—such as the Home Affordable Modification Program, and other similar programs implemented by the Federal Housing Administration, Fannie Mae, and Freddie Mac—to provide eligible homeowners with the opportunity to modify the terms of the mortgages so as to make them more affordable ("Modification Programs"). *See*, Class Action Complaint ("Complaint"), ¶ 14, filed in Adv. No. 19-08248-rdd (Reyes case) and Adv. No. 19-08249-rdd (Jackson case). Under the applicable guidelines for those Modification Programs, participating mortgage loan servicers ("Servicers")—such as Wells Fargo—are required to evaluate borrowers' eligibility for loan modifications ("Loan

---

[1] In their individual bankruptcy cases, Reyes and Jackson each filed an identical Complaint to initiate adversary proceedings against Wells Fargo. Although Plaintiffs intend to move the Court to consolidate those separate adversary proceedings and anticipate that the Court will do so, no such order had been entered at the time that this Motion was filed. Accordingly, identical copies of the instant Motion and Memorandum have been filed in both Reyes's and Jackson's adversary proceedings.

Modifications"). *See*, Complaint, ¶ 15. These eligibility requirements include a borrower's financial hardship, continued employment, income level, lack of prior Loan Modifications, etc. *Id*.

If a borrower is determined to be eligible for a Loan Modification, a Servicer may place that borrower into a "Trial Period Plan" ("TPP") before the Loan Modification becomes permanent. *See*, Complaint, ¶ 16. Under the terms of a TPP, a borrower is required to make "trial" mortgage payments over a period of three months. *Id*. If a borrower makes all required "trial" payments pursuant to the terms of a TPP and experiences no change relative to the other Modification Program eligibility requirements, then the borrower will be approved for a permanent Loan Modification. *See*, Complaint, ¶ 17. Courts have routinely held that TPPs constitute a contract between Servicers and borrowers, whereby Servicers are obligated to approve a permanent Loan Modification once a borrower makes all payments required under a TPP.[2] *See generally*, *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878 (9th Cir. 2013); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012).

Since Loan Modifications change the terms of existing mortgages, there is a risk that a Loan Modification will cause an existing, superior lien to become subordinate to other liens on a given property. *See*, Complaint, ¶ 19. As such, the guidelines for Modification Programs require Servicers to ensure that modified mortgages remain in a first lien position after a Loan Modification is completed (the "Subordination Process"). *Id*.

**B.  Wells Fargo's Loan Modifications**

---

[2] Since a borrower must *already* meet Modification Program eligibility requirements to be placed in a TPP, this contractual prerequisite is automatically satisfied assuming there is no change in a borrower's eligibility status.

3

In 2008, Wells Fargo, as one of the largest Servicers of home mortgages, entered into agreements with Fannie Mae, Freddie Mac and the Federal Housing Administration to take part in those Modification Programs. *See*, Complaint, ¶ 22. Accordingly, Wells Fargo began offering qualified borrowers—such as Plaintiffs and members of the Class defined in the Complaint—the opportunity to permanently modify the terms of their mortgages. *See*, Complaint, ¶¶ 24-25, 53, 70.

Since Plaintiffs and Class members were already determined to be eligible for permanent Loan Modifications, Wells Fargo offered to place Plaintiffs and Class members into TPPs. *See*, Complaint, ¶¶ 28, 54, 71. Pursuant to the terms of those TPPs, Wells Fargo agreed to give Plaintiffs and Class members permanent Loan Modifications upon Plaintiffs' and Class members' successful completion of their TPPs—*i.e.*, once they made all payments required under the TPPs—assuming their preexisting eligibility statues remained unchanged. *See*, Complaint, ¶¶ 28, 54, 71.

Although Wells Fargo knew that successful completion of the Subordination Process was necessary for Plaintiffs and Class members to obtain permanent Loan Modifications, Wells Fargo did not disclose this fact to borrowers and represented that it would give Plaintiffs and Class members permanent Loan Modifications upon Plaintiffs' and Class members' successful completion of their TPPs—*i.e.*, once they make all payments required under the TPPs. *See*, Complaint, ¶¶ 29, 31, 33, 55, 72. As such, the fact that Plaintiffs' and Class members' Loan Modifications would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages was not a term of the TPPs into which Plaintiffs and Class members entered with Wells Fargo. *See*, Complaint, ¶¶ 33, 36, 54, 71.

Based on Wells Fargo's representations concerning the terms of the TPPs that Plaintiffs and Class members entered into, they reasonably believed that they were eligible for the Loan

4

Modifications that they requested and that those Loan Modifications would become permanent once they made all payments required by their TPPs. *See*, Complaint, ¶¶ 32, 56, 73. Accordingly, Plaintiffs and Class members entered into TPPs with Wells Fargo. *Id*.

Plaintiffs and Class members made all modified mortgage payments pursuant to the terms of their TPPs, and continued to meet all eligibility requirements of the Modification Programs for which they applied. *See*, Complaint, ¶¶ 34, 58, 74, 76. As such, Plaintiffs and Class members fully performed their obligations under their TPPs and were contractually entitled to permanent Loan Modifications. *Id*. However, Plaintiffs and Class members never received permanent Loan Modifications because subordinate lienholders refused to subordinate their existing liens to Plaintiffs' and Class members' modified mortgages, and thus were denied permanent Loan Modifications as a result. *See*, Complaint, ¶¶ 35, 58, 76.

Sometime in 2013 or 2014, Wells Fargo began to warn borrowers that a permanent modification of their loan would not be approved unless subordinate lienholders agreed to subordinate their existing liens to borrowers modified mortgages. However, no such warning was given to Plaintiffs and members of the Class. *See*, Complaint, ¶¶ 26, 31, 33, 36, 55, 72. Accordingly, Wells Fargo misrepresented to Plaintiffs and Class members the material terms of the TPPs by stating that it would give Plaintiffs and Class members permanent Loan Modifications upon Plaintiffs' and Class members' successful completion of their TPPs—*i.e.*, once they made all payments required under the TPPs. *See*, Complaint, ¶¶ 31, 55, 72.

Since the successful completion of the Subordination Process was not a part of the contractual agreements between Wells Fargo and Plaintiffs and Class members, Wells Fargo breached the terms of the TPPs into which Plaintiffs and Class members entered. *See*, Complaint, ¶¶ 33, 36. Had Plaintiffs and Class members been aware that the Loan Modifications that they

requested would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages, they would not have agreed to enter into TPPs with Wells Fargo. *See*, Complaint, ¶¶ 37, 59, 77.

### C. The Nature of This Case

As set forth in the Complaint, Plaintiffs and Class members were harmed in several different ways as a result of Wells Fargo's conduct. First, Plaintiffs and Class members suffered financial damages in the form of payments they made pursuant to the terms of those TPPs. *See*, Complaint, ¶¶ 38, 60, 78. Second, by virtue of making payments pursuant to the terms of their TPPs, Plaintiffs and Class members reset the applicable statutes of limitations relative to the collectability of the debts secured by the mortgages. *See*, Complaint, ¶¶ 39, 61-62, 79-80. Finally, Plaintiffs and Class members suffered emotional damages related to the fact that they believed they had completed all prerequisites necessary to save their homes from being foreclosed upon, but then had the rug pulled out from under them by Wells Fargo when they were then informed that those efforts were insufficient. *See*, Complaint, ¶ 40.

The Complaint asserts several different causes of action, including breach of contract, fraud, and unjust enrichment.[3] *See*, Complaint, Counts I through VII. In addition to seeking redress for the damages Plaintiffs and Class members suffered, Plaintiffs, individually, and on behalf of the Class, seek appropriate injunctive and declaratory relief that would nullify the effect of the payments they made pursuant to the terms of their TPPs on the collectability of the debts secured by their mortgages. *Id.*

---

[3] The unjust enrichment cause of action is plead in the alternative to Plaintiffs' contractual theory of liability in the event that the Court determines there was no contract between the parties. However, as set forth above, courts have routinely held that TPPs constitute a contract between Servicers and borrowers. *See generally*, *Corvello*, 728 F.3d 878; *Wigod*, 673 F.3d 547.

## D. The Nature of This Motion

Although Plaintiffs and Class members have viable claims against Wells Fargo, Wells Fargo has recently been attempting to undermine Plaintiffs' and Class members' ability to attain full recovery relative to those claims. Last month, Wells Fargo began mailing letters ("Settlement Letters") with $300.00 checks ("Settlement Checks") enclosed to Plaintiffs and Class members advising them that Wells Fargo was "fixing" a problem related to their application for a loan modification that was ultimately denied. *See*, Complaint, ¶¶ 42, 63-65, 81-83, Exhibits B and E. Specifically, the Settlement Letters stated:

> We had previously approved this loan for a modification trial plan, but the loan was subsequently removed from home preservation prior to the final modification. We should have let you know at the time of trial approval that the modification might be denied due to title issues even if you paid the trial period payments…We've enclosed a check for $300.00 to fully settle this issue.

*Id*.

However, $300.00 does not come close to adequately compensating Plaintiffs and Class members for the damages they incurred as a result of Wells Fargo's conduct. *See*, Complaint, ¶¶ 43, 66, 84. Indeed, Reyes paid $10,403.67 to Wells Fargo pursuant to the terms of his TPP that he would not otherwise have paid, and Jackson paid $9,449.05 to Wells Fargo pursuant to the terms of her TPP that she would not otherwise have paid. *See*, Complaint, ¶¶ 66, 84.

As set forth in the Complaint, the Settlement Letters are an unduly coercive act on the part of Wells Fargo, as Wells Fargo seeks to take advantage of Class members' difficult financial situations and knows that Class members are unlikely to be aware of "what they are possibly giving

up" by cashing the Settlement Checks. *See*, Complaint, ¶¶ 44-49 (quoting *Friedman v. Intervet Inc.*, 730 F.Supp.2d 758, 763 (N.D. Ohio 2010) (collecting cases)).

Accordingly, Plaintiffs bring the instant Motion to preserve absent Class members rights—*i.e.*, to ensure that Plaintiffs and Class members do not waive their right to recover damages in this action in the event that they cash the checks that Wells Fargo sent with the Settlement Letters—until the issues in this case can be adjudicated.

### E. Plaintiffs' Standing to Seek Preliminary Injunctive Relief

The Second Circuit has made clear that "in a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual…injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2nd Cir. 2012) (internal citations and quotations omitted); *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 161 (2nd Cir. 2014); *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 156 (S.D.N.Y. 2017); *Fernandez v. UBS AG*, 222 F.Supp.3d 358, 372 (S.D.N.Y. 2016); *see also*, *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998) ("Once an individual has alleged a distinct and palpable injury to himself he has standing to challenge a practice even if the injury is of a sort shared by a large class of possible litigants."); *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action…adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."). When these two requirements "are met, the named

plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf." *Fernandez*, 222 F.Supp.3d at 372 (quoting *New York Mellon*, 775 F.3d at 161) (internal quotations omitted).

Here, because Plaintiffs were harmed as a direct and proximate result of Wells Fargo's conduct, they have standing to pursue their claims against Wells Fargo generally. *See*, Complaint, ¶¶ 60-62, 66, 78-80, 84. Absent Class members suffered the same injuries and were harmed in the same way as Plaintiffs. *See*, Complaint, ¶¶ 38-40, 89-90. In fact, absent Class members are at a *heightened* risk of harm, as they are likely unaware of the legal implications of cashing the Settlement Checks, and are more prone to be deceived by Wells Fargo's coercive tactics and unknowingly waive their claims against Wells Fargo. *See*, Complaint, ¶¶ 46-49. As such, Plaintiffs have standing to pursue the preliminary injunction requested herein on behalf of the Class.

## II. STANDARD OF REVIEW

The decision to grant a preliminary injunction lies within the sound discretion of the Court. *E.g.*, *Am. Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2nd Cir. 1998); *Weinstein v. Krumpter*, 120 F.Supp.3d 289, 296 (E.D.N.Y. 2015); *Peck v. Montefiore Med. Ctr.*, 987 F.Supp.2d 405, 410 (S.D.N.Y. 2013). "In order to justify a preliminary injunction, a movant must demonstrate (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." *E.g.*, *Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, 468 Fed. Appx. 43, 45 (2nd Cir. 2012) (quoting *Metro. Taxicab Bd. of Trade v. City of N.Y.*,

9

615 F.3d 152, 156 (2nd Cir. 2010)); *Rex Med. L.P. v. Angiotech Pharmaceuticals (US), Inc.*, 754 F.Supp.2d 616, 620 (S.D.N.Y. 2010).

"Generally, the purpose of a preliminary injunction is to preserve the status of the parties until a determination on the merits of the movant's claims can be made." *VOX Amplification Ltd. v. Meussdorffer*, 50 F.Supp.3d 355, 370 (E.D.N.Y. 2014) (alterations omitted); *Benitez v. King*, 298 F.Supp.3d 530, 535 (W.D.N.Y. 2018). Although "a heightened showing is necessary" when a preliminary injunction would command an affirmative act by the non-moving party, such is not the case here, as the injunctive relief sought herein only seeks to preserve the rights of the parties pending the resolution of this case. *See, e.g.*, *Weinstein*, 120 F.Supp.3d at 296 (collecting cases).

### III.   ARGUMENT

    **A.   Plaintiffs and Class Members Will Suffer Irreparable Injury Absent an Injunction**

As noted above, the $300.00 Settlement Checks enclosed with the Settlement Letters that Wells Fargo sent to Plaintiffs and Class members are a mere pittance compared to the full amount of damages that they suffered as a result of Wells Fargo's conduct. *See*, Complaint, ¶¶ 43, 66, 84. However, due to their difficult financial situations, Plaintiffs and Class members desire to cash the Settlement Checks they received, but cannot do so because it would fully release all of their claims against Wells Fargo. *See*, Complaint, ¶¶ 45, 67, 85. In sum, Plaintiffs and Class members have been placed in the unenviable position of being required to make a choice between accepting much-needed money now and waiving their claims against Wells Fargo, or foregoing that money to hold out for a larger recovery.

"If [the] Court waits until the end of trial to resolve" the question of whether cashing the Settlement Checks constitutes a release of Plaintiffs' and Class members' claims, Plaintiffs and

Class members would be irreparably harmed because additional "money damages [would] be unavailable" and the $300.00 offered by Wells Fargo would be "inadequate." *See, e.g.*, *Millennium Pipeline Co., L.L.C. v. Seggos*, 288 F.Supp.3d 530, 542 (N.D.N.Y. 2017); *Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F.Supp.3d 264, 273 (N.D.N.Y. 2015); *see also*, *City of Pontiac Retired Emples. Ass'n v. Schimmel*, 751 F.3d 427, 432 (6th Cir. 2014) (holding that a reduction in recovery, even when not "*completely* eliminated…can cause irreparable harm") (emphasis in original). Accordingly, Plaintiffs and Class members are at a substantial risk of future harm, which is sufficient to grant the injunctive relief requested herein. *See, e.g.*, *Spiro v. Healthport Techs., LLC*, 73 F.Supp.3d 259, 270 (S.D.N.Y. 2014); *Millennium Pipeline*, 288 F.Supp.3d at 542; *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2nd Cir. 2007); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

Moreover, although Plaintiffs are aware of the implications of cashing the Settlement Checks, many absent Class members are not. *See*, Complaint, ¶¶ 46-49. Indeed, many Class members are not represented by counsel, and have no idea that they may even have a claim against Wells Fargo. *See*, Complaint, ¶ 47. As such, many Class members will view the checks enclosed with the Settlement Letters as an act of generosity on the part of Wells Fargo, would be unaware of the legal implications of cashing those checks, and would be unlikely to consult with counsel regarding those legal implications. *See*, Complaint, ¶ 48. As set forth below, this compounds the risk of irreparable harm to absent Class members, whom the Court has a fiduciary duty to protect. *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 359981, at *36 (E.D.N.Y. 2019); *Weinberger v. Kendrick*, 698 F.2d 61, 69 n. 10 (2nd Cir. 1982) (The Court is "a guardian for class

11

members who have not received a notice or who lack the intellectual or financial resources to press objections.") (collecting cases).

Many courts have observed that "a unilateral communications scheme [from a defendant to putative class members]…is rife with potential for coercion." *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir. 1985). "Unsupervised unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal." *Id.* at 1203. Therefore, "a district court may, under Rule 23 [of the Federal Rules of Civil Procedure] impose limitations on communications between parties and members of a class or putative class." *Friedman*, 730 F.Supp.2d at 761 (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101-02 (1981)). As such, Defendants cannot "procure[] settlements and releases without informing putative class members of what they are possibly giving up[.]" *Friedman*, 730 F.Supp.2d at 763. In such instances, "an act of *omission* may be just as culpable as one of *commission*." *Id.* at 763, n. 5 (emphasis in original) (internal citations omitted).

Because of this "potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil*, 452 U.S. at 100; *see also Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 759 (7th Cir. 2000) ("The discretion to issue such orders has been vested with the trial courts because it is well-recognized that class actions present opportunities for abuse as well as problems for courts and counsel in the management of cases."). Importantly, a district court's ability to limit a defendant's communication with putative class members "applies even before the court has certified a class[.]" *Friedman*, 730 F.Supp.2d at 761 (internal citations omitted).

Here, Wells Fargo has *not* "inform[ed] putative Class members of what they are possibly giving up[]" (*Friedman*, 730 F.Supp.2d at 763) because the Settlement Letters fail to advise Class members of several types and amounts of damages that may be recoverable in this action, including contractual damages, and other non-economic damages—such as emotional distress—sought in the Complaint (*See*, Complaint, Counts I through VII). Additionally, in light of the circumstances under which the Settlement Letters were sent to Plaintiffs and Class members, and Wells Fargo's knowledge thereof, the Settlement Letters are an unduly coercive act on the part of Wells Fargo designed to deceive Class members into releasing their claims. *See*, Complaint, ¶¶ 44-49. As set forth above, many Class members will view the Settlement Checks as an act of generosity on the part of Wells Fargo, and are more likely to accept pennies on the dollar to waive any claims they may have against Wells Fargo without understanding all of the damages to which they are entitled and without appreciating the benefits of this litigation. *See*, Complaint, ¶¶ 46-48.

It is axiomatic that permitting Wells Fargo to continue to engage in misleading communications with absent Class members will ultimately result in Class members cashing their Settlement Checks, and as a result, waiving any possibility of being fully compensated for their injuries. While Wells Fargo may argue that the checks represent at least *some* compensation and thus, there is at best a reduction in compensation rather than a denial of full benefits, the courts have held that the *reduction* itself can be the irreparable harm. *E.g.*, *City of Pontiac*, 751 F.3d at 432. As noted above, the $300.00 offered by Wells Fargo in its Settlement Letters does not come close to adequately compensating Plaintiffs and Class members for the damages they incurred as a result of Wells Fargo's conduct (*See*, Complaint, ¶¶ 43, 66, 84), and therefore poses a risk of irreparable harm. *E.g.*, *Millennium Pipeline*, 288 F.Supp.3d at 542.

13

Only this Court's intervention can restrain Wells Fargo from attempting to enforce a release from unsuspecting unsophisticated consumers to whom the Settlement Letters were addressed. Therefore, the preliminary injunction requested herein is necessary to avoid irreparable harm.

**B.     Plaintiffs Are Substantially Likely to Succeed on the Merits**

In the Complaint, Plaintiffs alleged multiple potential causes of action, including breach of contract, fraud, and unjust enrichment. *See*, Complaint, Counts I through VII. Courts across the country have routinely held that these are viable causes of action in cases against *Wells Fargo* presenting substantially similar facts. *See generally*, *Corvello*, 728 F.3d 878; *Wigod*, 673 F.3d 547. Moreover, Wells Fargo has *admitted* its wrongful conduct in the Settlement Letters, and went so far as to offer Plaintiffs and Class members compensation for that misconduct. *See*, Complaint, ¶¶ 42, 63-65, 81-83, Exhibits B and E.

**C.     The Balance of Hardships Favors Plaintiffs and the Class**

As noted above, there is a substantial risk of harm to Plaintiffs and members of the Class if the requested preliminary injunction is denied. *See*, Section III-A, *supra*. In contrast, there is no significant risk of harm to Wells Fargo if the Court grants the Motion, as Wells Fargo would still have an opportunity to contest Plaintiffs' and Class members' claims on the merits. In fact, the requested injunction would benefit Wells Fargo because it would likely result in fewer Settlement Checks being cashed.

The only effect of the requested preliminary injunction would be to slow down the settlement and release process that Wells Fargo has waited nearly a decade to embark upon. *See*, Complaint, ¶¶ 42, 44, 52, 63, 69, 75, 81. Given the coercive nature of Wells Fargo's Settlement

14

Letters, the balance of hardships clearly favors Plaintiffs and members of the Class. *See*, Complaint, ¶¶ 44-49.

### D. The Public Interest Will Be Served by Issuing a Preliminary Injunction

Wells Fargo has admitted repeatedly harming its customers in almost every aspect of its business. For example, in 2017 a CFPB investigation revealed that Wells Fargo was opening false accounts in its customers' names without its customers' consent. In August 2018, Wells Fargo revealed in its SEC filings that 860 borrowers were wrongly denied Loan Modifications based on a purported "computer glitch." Wells Fargo has also admitted charging auto loan customers for insurance that they did not want, and in April 2018, the Consumer Financial Protection Bureau fined Wells Fargo $1 billion for its scam.

This Court is acutely aware of Wells Fargo's penchant for misconduct, as the Honorable Robert Drain detailed Wells Fargo's use of forged documents in a court proceeding and noted the "general willingness and practice on Wells Fargo's part to create documentary evidence, after-the-fact, when enforcing its claims." *See* Order entered Jan. 29, 2015, in the matter *In re. Cynthia Carrsow-Franklin*, No. 10-20010 (RDD) (Bk. Ct. S.D.N.Y.), Dkt. #109.

Here, the public interest is front and center because Wells Fargo was administering the Home Affordable Modification Program pursuant to a contract with the United State Department of Treasury, and Wells Fargo's misconduct that is the subject of this case occurred during its administration of that government loan program.

### IV. CONCLUSION

WHEREFORE, Plaintiffs Justo Reyes and Karen Jackson, individually, and on behalf of the Class, respectfully request that the Court issue a preliminary injunction enjoining Defendant

15

Wells Fargo Bank, N.A. and all persons acting on its behalf, from (1) sending misleading communications with settlement offers to members of the putative Class and (2) enforcing any purported "settlement" or waiver of Plaintiffs' and Class members' rights to recover damages in this action in the event that they cash the checks that Wells Fargo sent with the Settlement Letters, and for any other relief deemed just under the circumstances.

| | |
|---|---|
| **DATE: White Plains, New York<br>April 15, 2019** | Respectfully Submitted,<br><br>/s/Linda M. Tirelli<br>Tirelli Law Group, LLC<br>50 Main Street, Suite 1265<br>White Plains, NY 10606<br>(914) 732-3222<br><br>Javier L. Merino<br>DannLaw<br>1 Meadowlands Plaza, Suite 200<br>East Rutherford, NJ 07073<br>(201) 355-3440<br>(216) 373-0536 e-fax<br>notices@dannlaw.com<br><br>Thomas A. Zimmerman, Jr.<br>*tom@attorneyzim.com*<br>Matthew C. De Re<br>*matt@attorneyzim.com*<br>ZIMMERMAN LAW OFFICES, P.C.<br>77 W. Washington Street, Suite 1220<br>Chicago, Illinois 60602<br>(312) 440-0020 telephone<br>(312) 440-4180 facsimile<br>*Pro Hac Vice Anticipated*<br><br>Marc E. Dann<br>Brian D. Flick<br>DANNLAW<br>P.O. Box 6031040<br>Cleveland, OH  44103<br>(216) 373-0539 telephone<br>(216) 373-0536 facsimile |

*notices@dannlaw.com*
*Pro Hac Vice Anticipated*

*Attorneys for Debtors and the Class*